FIRST NAT. BANK OF MIDLAND v. POWELL.

(Court of Civil Appeals of Texas. El Paso. March 12, 1914. Rehearing Denied April 9, 1914.)

1. BILLS AND NOTES (§ 516*)—DISCHARGE OF INDORSER—RELEASE OF SECURITY—CONSENT OF INDORSER—SUFFICIENCY OF EVIDENCE.

In an action against defendant as indorser of a note secured by a chattel mortgage, executed to him for cattle sold, evidence *held* to show that defendant consented to a sale of the cattle by the one purchasing them from him, so that the consent of the indorsee to the sale did not discharge the indorser from his liability as such.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 1800–1806; Dec. Dig. § 516.*]

2. BILLS AND NOTES (§ 301*)—DISCHARGE OF INDORSER—RELEASE OF SECURITY—SALE OF PROPERTY.

If the payee and indorser of a note, received for cattle sold and secured by a mortgage on the cattle, consented to their sale by the mortgagor, he could not escape liability on the note as an indorser because such sale was also consented to by his indorsee; his consent waiving his right to insist that the indorsee should maintain the security unimpaired.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 706–721; Dec. Dig. § 301.*]

3. BILLS AND NOTES (§ 301*)—RIGHTS OF INDORSER.

It would be immaterial upon the rights of the indorser of a note received for cattle and

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

secured by a mortgage on the cattle, that the proceeds of a sale of the cattle, which were sold with the consent of the indorser and indorsee, were reinvested before they finally came into the possession of the indorsee.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 706–721; Dec. Dig. § 301.*]

**4. BILLS AND NOTES (§ 301*)—DUTIES OF IN-DORSEE.**

If any of the proceeds of mortgaged property came into the hands of the indorsee of the secured note, it was its duty to apply them to the payment of the note if it knew that the money was the proceeds of such property or was chargeable with such knowledge.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 706–721; Dec. Dig. § 301.*]

**5. BILLS AND NOTES (§ 301*)—SALE OF PROP-ERTY—RIGHTS OF MORTGAGEE.**

If a chattel mortgagee consented to a sale of the mortgaged property, he was entitled to credit, when sued on the secured note by his indorsee, only for the proceeds of the property to the sale of which he consented.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 706–721; Dec. Dig. § 301.*]

Appeal from District Court, Ector County; Dan M. Jackson, Judge.

Action by the First National Bank of Midland against L. P. Powell. From a judgment for defendant, plaintiff appeals. Reversed and rendered.

E. M. Whitaker, of El Paso, J. M. Caldwell, of Midland, and A. S. Hawkins, of Phœnix, Ariz., for appellant. Goree & Turner, of Ft. Worth, F. A. Judkins, of Odessa, and Theodore Mack, of Ft. Worth, for appellee.

HIGGINS, J. This is the second appeal in this case; former opinion appearing in 149 S. W. 1096. It is a suit by appellant against appellee as an indorser upon a promissory note in sum of $5,793, dated May 11, 1909, due four months after date, executed by A. A. Frields, payable to order of appellee, bearing interest from date at rate of 10 per cent. per annum, payment of which was secured by chattel mortgage upon 200 head of steers. Frields was not made party defendant; his insolvency and residence beyond the limits of the state being alleged as excuse for not suing him.

Powell was the owner of said 200 head of steers situate in Midland county, Tex., which he desired to sell and which Frields desired to purchase. Not having the money to pay for same, Frields conferred with the appellant bank, and it was agreed between all parties that Frields should give his note to Powell to cover the purchase price, secured by chattel mortgage upon the cattle, and the bank was to cash the note for Powell, who was to transfer the note and mortgage to the bank. The bank was to prepare and did prepare all of the necessary papers, and it was understood by all parties that the cattle were to be removed by Frields to Caddo county,

Okl., and the mortgage so provided. The mortgage contained the following provisions: "If default be made in any of the conditions herein contained, or any part thereof, or, if any secreting or removal from their location, any abuse or misuse, any sale, any seizure whatever by any proceeds of law of said described personal property, or of any part of it, be either made or attempted by said mortgagor, or by any person or persons claiming under him or in behalf of either or by or in behalf of any creditor or creditors of said mortgagor, or, if from any other cause the security shall become inadequate, or the mortgagee shall at any time during this mortgage become apprehensive of the ability of the mortgagor to perform any of the conditions, covenants or agreements herein contained, then and in such case, the said mortgagee, L. P. Powell, and successors, are hereby fully authorized and empowered to take immediate possession of the property hereinbefore described, and sell same at public auction, for cash, at the door of the County Court House, in Caddo County, Oklahoma, by giving the notice of the time and place of sale, as is now required by the statutes of the State of Oklahoma, in sales of personal property under execution. * * *" After their removal to Oklahoma the cattle were shipped to market by Frields and sold and the proceeds appropriated by him. The note was transferred to the bank by ordinary blank indorsement, and the amount thereof paid by the bank to Powell.

The answer of defendant is very voluminous, and it is not necessary to detail the various matters and defenses set up.

The cause was tried before a jury and submitted upon special issues. The issues submitted and answers thereto read:

"1. Did A. A. Frields make, execute, and deliver the note sued on and the mortgage, securing the same? A. Yes.

"2. Did L. P. Powell indorse said note to the First National Bank of Midland? A. Yes.

"3. Did A. A. Frields dispose of and sell the cattle mentioned in the mortgage, if any, after he had transferred same from Midland, Tex., to Oklahoma, if he did?. A. Yes.

"4. Did plaintiff herein, acting through its officers, Judge E. R. Bryan and W. H. Cowden, or either of them, consent to the sale, if any, by Frields of the cattle mentioned in the mortgage? A. Yes.

"5. Did the defendant, L. P. Powell, consent to the sale, if any, by Frields, of the cattle mentioned in the mortgage? A. No.

"6. If you have answered question 3 in the affirmative, please state what was the reasonable market value of the mortgage security, if any, meaning the Powell-Frields cattle? A. $5,800.

"7. If you have answered questions Nos. 3 and 4 in the affirmative, then answer: Did any of the proceeds of the Powell cattle ever

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

come into the possession of the plaintiff, at any time? A. Yes.

"8. If you have answered question No. 7 in the affirmative, then answer this: Were the proceeds received under such circumstances that the plaintiff knew or should have known that same was or were the proceeds of said mortgaged property? A. Yes.

"9. If you have answered question No. 8 in the affirmative, please say what part or portion, if any, of the proceeds of the mortgage security, that is the Powell cattle, came into the possession of the bank after Mr. Bryan and Mr. Cowden or either of them, knew, or the circumstances surrounding the transactions were such that they should have known, that said funds or any of them coming into their possession, were the proceeds of the mortgage security? A. $6,475.66.

"10. If you have answered the above question, No. 9, that any portion or part of the proceeds came into the possession of the bank, then please state what the amounts were and the dates of same, give amount or amounts and date of same. A. $6,475.66."

The first assignment complains of the refusal of a peremptory instruction in favor of appellant, and in support thereof it is first urged that the peremptory instruction should have been given because the evidence disclosed that, at the time of the consummation of the transaction out of which this litigation arose, Powell agreed that Frields might sell the cattle, which consent precluded him from claiming a release from liability upon his indorsement contract, by reason of any consent which the bank might likewise have given to such sale. In other words, the consent of the bank to the sale of the cattle by Frields did not release Powell as an indorser upon the note, because he likewise had consented, and was a party to the arrangement.

[1] In connection with this contention, we will consider the fourth assignment to the effect that the finding of the jury in response to the fifth issue, that Powell did not consent to the sale of the cattle, is contrary to the undisputed evidence.

Powell testified:

"I first went around to the bank to see Mr. Cowden. I went there for the purpose of making this deal; went to see as to Frields' responsibility, and to see if they would cash the note. I asked Mr. Cowden to take the note without my indorsement. He refused to do that. I indorsed the note, simply putting my name on the back of the note, 'L. P. Powell.' I said that when this mortgage was drawn up it was contemplated that I should be away, and it was understood that Judge Bryan would fix the mortgage for me. I suppose that he did that. I have no complaint to make at that. I do not know anything about the mortgage. I never paid him anything for drawing this mortgage. The note was drawn up and left at the bank, and the cattle were turned over, and I went in and signed the note the first time I was in Midland, afterwards. I did not get the money until I put my name on the back of the note. As to whether or not it is a fact that I knew in August before the note became due that Frields was shipping out a number of these cattle—Mr. Cowden told me he was shipping out some cattle. I knew it from him. I did not make any objection. It was none of my business. I did not agree with Frields at all that the cattle were to be taken to Oklahoma. I heard him tell Cowden they were going to be taken to Oklahoma. At the time I made the trade I knew that the cattle were to be taken to Oklahoma. I made no objection to the arrangements to that effect. I knew Frields was going to take the cattle out of the state; understood so. I knew he was buying them for that purpose. I did not know that they had gone out of the state before I got the money on the note. I did not know what had become of them. I supposed they had gone out of the state. I didn't see them go out of the state. I understood so, but I did not know it. I had the cattle turned over to Frields by Jordan, for me. I do not know whether or not he was my agent. I was buying them from him. I authorized him, and the bank, together, to turn them over to him. I do not know whether or not I asked Judge Bryan to draw up this note and mortgage. We had a conversation to that effect. I do not know whether I asked him, or he volunteered to do it; he represented the bank. I do not know whether I asked him, or just how it was. I could not say.

"I never told Frields that he could ship the cattle to Oklahoma. I do not know whether either yes or no will apply to the question, but I will say no to the question, 'Were they shipped out of the state with your consent or without your consent?' I do not know whether or not I answered yes to that question last term of court. I did not tell him he could ship them out of the state, because he didn't ask me. I might have sat there and not said anything. I did not say whether he could ship them out. I do not mean that I told him that he could ship them out. I might have consented by not saying anything, if you call that consent. I knew the cattle were intended to be shipped out of the state. I understood that they were to be sold when they got fat. Frields told Cowden that he expected to sell them on the market in order to get money to pay the note; told him that in my presence. He told Cowden, in my presence, that he probably would begin shipping out the cattle in 60 days. I understood that, when the cattle were sold to Frields, they would be shipped to Oklahoma. I understood he told him that they were to be shipped out and fattened to go on the market. At to whether I made an objection when I understood that Frields was shipping them out in 60 days—it was none of my business. I did not at the expiration of 60 days make inquiry as to whether or not he was shipping

them out. I do not remember whether or not Judge Bryan was there, at the time of the conversation as to selling the cattle when they got fat; I do not think so. Frields told him they were going to ship out the cattle when they gathered in about 60 days. That conversation was between Frields and Cowden. The remarks were not addressed to me; I did not make any reply to them. As to why I did not make any reply or objection, it was not any of my arrangements. I never in any way, at any time, with Mr. Bryan or Mr. Cowden, or with Mr. Frields, consented that these cattle might be shipped out of Oklahoma and sold, prior to the maturity of the debt and the mortgage. I understood these cattle were going to Oklahoma. I consented for him to make that arrangement with Cowden. I did not consent for him to do anything. I knew they were going to Oklahoma. I consented for him to make that arrangement with Cowden. I knew they had to go to Oklahoma. That did not include the shipment of the cattle out when they were fat, which it was understood was about 60 days. The statement that the cattle would be shipped out in about 60 days was Cowden and Frields talking; they made that arrangement in my presence. I did not consent for him to do it. I did not state that I consented to the terms and details being arranged by Cowden and Frields, in my presence; I did not have anything to say in it. I heard the arrangements made, in my presence, before I got a dollar on the note. I do not know whether or not that was a part of the trade with reference to these cattle, part of the condition of which they were bought. I heard him—heard them talking about that; I do not know whether that made any difference with Cowden or not. That was all talked over before a dollar was put up—before I turned over the cattle. I suppose that was part of the understanding before the bank put up a dollar, or before I turned over a steer. It was without my permission that the understanding was had that the cattle were to go to Oklahoma and be shipped out in about 60 days. I suppose that was the understanding with them. I understood that was the arrangements, among themselves. I understood that that was the original trade made right there; that was what they did. I consented for them to make the arrangements that the cattle were to go to Oklahoma; I didn't have a word to say about the cattle going to Oklahoma. They made the arrangements; not with my knowledge and consent, but with my knowledge. I heard him tell Frields, heard him make that arrangement, that the cattle were to go to Oklahoma and be shipped out in 60 days."

[2] In the light of this testimony there can be no doubt that Powell, when negotiating with Frields for the sale of the cattle and with the bank to cash the note which Frields proposed to give, was fully cognizant that it was contemplated and understood by Frields and the bank that Frields was to ship the cattle to market when ready, sell same, and apply proceeds upon note, and was a party to such arrangement. While he denies that he consented, yet this denial is a false conclusion which he deducts from the fact that he did not in express terms signify assent. His confessed silence and acquiescence in the understanding when the negotiations were in progress is susceptible of no other possible interpretation, except that he at least impliedly consented, and he cannot escape the consequences of his conduct by afterwards denying what his conduct indubitably established. The finding of the jury in response to the fifth issue that he did not consent to the sale is contrary to the facts shown and admitted by his own testimony, and we find that he did so consent. Authority upon the question is not necessary. The facts as he himself relates them speak for themselves, and if he consented to the sale he can with ill grace seek, and will not be permitted, to escape liability because the sale was likewise consented to by the bank. Such consent upon his part constituted a waiver of his right to insist that the bank should maintain unimpaired the security and not consent to sale thereof by Frields.

[3] The fourth proposition attacks the sufficiency of the evidence to support the finding upon the seventh issue; the contention in effect being that the finding that the proceeds of the Powell cattle came into the hands of the bank is unwarranted because such proceeds were not the direct proceeds of Powell cattle, but of other cattle that had been bought and paid for with such proceeds. This position is not sound. It matters not that the proceeds may have been once reinvested before reaching the bank. They were nevertheless the proceeds of the Powell cattle which came directly into the hands of the bank. The former opinion rendered in this case does not conflict with this view. Upon that appeal the fifth paragraph of the charge was criticised for laying down the doctrine that Powell was released if proceeds of the cattle came indirectly into the hands of the bank, and it was not intended to hold that it would not be released if moneys came into its hands which were the indirect proceeds of the cattle in the manner indicated. The distinction is clear between proceeds that may be indirect and proceeds that may have indirectly come into its hands.

The fifth proposition, submitted in support of the first assignment, reads: "A mortgagee has no lien on the proceeds arising from the voluntary sale of the chattels by the mortgagor, and hence any moneys coming into the hands of the appellant bank and deposited to the credit of the mortgagor stood on the same footing as any other deposits, by the mortgagor, even though such deposits may have been the proceeds of property purchased by the mortgagor with the original proceeds of the mortgaged property."

[4] This contention was fully considered and adversely disposed of upon former appeal in the following language: "If any of the proceeds of the mortgaged property came into the hands of the bank, it was its duty to appropriate and apply the same to the payment of the note sued upon if it knew that such moneys were proceeds of the mortgaged property, or if the circumstances were such as to charge it with such knowledge. It is but the application of the principle that, when mortgaged property comes into the hands or under the control of the creditor and is then lost by his negligence or design, the surety is released to the extent of the security so lost. Murrell v. Scott [51 Tex. 520], and Grisard v. Hinson [50 Ark. 235, 6 S. W. 907]; 1 Brandt on S. & G. (3d Ed.) § 498. It appears that a portion of the proceeds of the mortgaged property was deposited by Frields with the bank, which he was afterwards permitted to check out, and to permit him to do so, with knowledge of the fact that such moneys were the proceeds of the mortgaged cattle, would be in violation of the rule just quoted and would release Powell to that extent; and the same rule would apply although the bank had no actual knowledge of the character of the moneys, if the surrounding facts and circumstances were sufficient to charge them with notice of the character of such money, or put them on inquiry in regard thereto." Bank v. Powell, 149 S. W. 1096.

The contention is next made under the sixth, seventh, and eighth propositions, supporting the first assignment, that the evidence was insufficient to charge the bank with notice of the fact that the money deposited by Frields was the proceeds of the cattle purchased with the original proceeds of the Powell cattle. The evidence upon the issue is circumstantial and quite lengthy. It has been carefully considered and the conclusion reached that all of the surrounding facts and circumstances connected with this transaction from its inception were sufficient to support the eighth finding that certain deposits were made by Frields under such circumstances that the bank should have known that same were proceeds of the Powell cattle.

Error is next assigned to the refusal of the court to render judgment for the face of the note with interest and attorney's fees as therein provided, less the sum of $3,747.23, because the undisputed evidence discloses that was all of the proceeds of the Powell cattle which came into hands of the bank. The uncontroverted evidence discloses that 52 head were shipped on June 12th and sold for for $1,455; 40 head on July 26th and sold for $1,042.09; 28 head on August 1st and sold for $606.65; 31 head were shipped August 7th and sold for $652.59. There was another shipment of September 19th, which contained 43 head of the Powell cattle; but there is no evidence of the amount for which they sold, and, furthermore, the proceeds of this last shipment did not come into the hands of the bank, as September 13th was the date of the last deposit made by Frields. The foregoing shipments account for all of the Powell cattle, except four that died and two that strayed and were lost. This assignment must therefore be sustained, and since this was the fourth trial, and the evidence has been fully developed, the cause will be reversed and judgment here rendered in favor of the bank for the face of the note sued upon with interest and attorney's fees, less the sums aforesaid, as in case of partial payments, viz., $1,455 paid on June 12, 1909; $1,042.09 paid on July 26, 1909; $606.65 paid on August 1, 1909; and $652.59 paid on August 7, 1909.

Appellee replies to this assignment: First: "There being abundant evidence to sustain the findings by the jury that the bank through its officers consented to the sale of the mortgaged property, and that Powell did not consent to the same, and the reasonable market value of the mortgaged security was $5,800, such finding by the jury entitled the defendant below to a release as surety to the extent of the value of the property so disposed of; such act being an affirmative act upon the part of the bank." And second: "The amount realized from the sale of the mortgaged property is not a test of the relief to which the defendant is entitled. The measure of defendant's damages which may be used to offset or recoup the amount of plaintiff's recovery is the reasonable market value of the mortgaged property at the time of the sale of the mortgaged property under the affirmative act of the bank."

[5] These contentions are disposed of by our finding that Powell consented to the sale of the cattle. Since he consented, he is entitled to credit only for the proceeds as was held upon the former appeal. Furthermore, the finding of the jury that the cattle were of the reasonable market value of $5,800 is supported only by the testimony of Powell that the 200 head were worth $29 per head at Midland at the time the note was executed. This does not show their market value at a different time and place, and the undisputed evidence discloses that they were sold on the Kansas City market at the highest market prices. For both of the reasons indicated, the counter propositions of the appellee are untenable.

By the sixth assignment it is complained that the finding of the jury upon the sixth issue that the Powell cattle were of the reasonable market value of $5,800 is unsupported by the evidence. As is just indicated above, this contention is well taken and the assignment is sustained.

The seventh assignment complains of the insufficiency of the evidence to support the finding upon the ninth issue that $6,475.66 came into the hands of the bank as the proceeds of the Powell cattle. This likewise is

sustained. As shown above, the amount of the proceeds of the Powell cattle which could possibly have reached the bank were the proceeds of the four shipments mentioned, viz., $1,455, $1,042.09, $606.65, and $652.59— a total of $3,756.33.

Assignments Nos. 11, 12, 13, 14, and 15, are overruled. If any of them present error, it is not reversible in its nature.

Under the views expressed it becomes unnecessary to pass upon various other assignments appearing in the record.

The cause is reversed and judgment here rendered in favor of appellant for $2,387.01, with interest thereon from September 11, 1909, at the rate of 10 per cent. per annum, and that it recover all of its costs.